**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lori E. Kant,              ) | |
|                            ) | No.  CIV 05-1189-PHX-DKD |
|         Plaintiff,         ) | |
|                            ) | **ORDER** |
| vs.                        ) | |
|                            ) | |
| Social Security Administration, ) | |
|                            ) | |
|         Defendant.         ) | |
|                            ) | |

Plaintiff Lori E. Kant appeals the Commissioner of the Social Security Administration's decision to adopt the Administrative Law Judge's ("ALJ") ruling denying her claim for disability benefits. In denying Kant's claims, the ALJ rejected her testimony and her treating physician's testimony, without providing clear and sufficient reasons for doing so, and in addition, adopted the opinion of a nonexamining physician.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and upon consideration of the cross motions for summary judgment and the arguments of counsel at oral argument concludes that the ALJ's reasons for denying Kant's claim are not supported by substantial evidence.  Further, because the Court finds that once the treating physician's opinion is properly credited and accepted as a matter of law, a finding of disability is shown, it concludes that a remand for further proceedings is unnecessary.  The Court finds that the record is complete and that the matter should be remanded for payment of benefits. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636 (c).

**BACKGROUND**

Kant was born on July 22, 1962. She filed for disability benefits in November 2002, alleging disability as of August 2001. (Claimant's Statement of Facts "CSOF" ¶ 1). She has a history of Raynaud's syndrome, fibromyalgia, lupus, irritable bowel syndrome, insomnia, and fatigue (Tr. 388). Her previous work experience includes employment as an office manager and sales team manager (Tr. 103-12). She has not worked since August 2001 (Tr. 39).

**Treating Physicians**

Kant was treated at Kaiser Permanente from February through June 2002. A rheumatological evaluation was performed in May 2002, indicating a history of lupus, chronic fatigue syndrome, and irritable bowel syndrome (Tr. 194-195). She complained of general body aches, difficulty with concentration and memory, and was prescribed Robaxin and Naprosyn (Tr. at 194). Dr. Venkat noted in May that the clinical findings were "suspicious for fibromyalgia syndrome," and in June found her lupus to be stable (Tr. 187, 195).

By October 2002, Kant had discontinued treatment at Kaiser, and was seen by Dr. Liao through Cigna Healthplan; her treatment through Cigna continued through September 2003 (Tr. 206-30, 324-40). In October 2002, Dr. Liao ordered a rheumatology evaluation and requested that she return in two weeks for a follow up (Tr. 228). In December 2002, Dr. Mallace, a rheumatologist also through the Cigna plan, performed the suggested rheumatology evaluation, and in noting mild depression and irritable bowel syndrome, increased her Plaquenil dosage (Tr. 220-24). Dr. Liao and Dr. Mallace continued treatment of Kant over the succeeding months, noting "some improvement about her systemic symptoms," but chronic joint aches and stiffness (Tr. 216). In March and July 2003, Dr. Mallace repeatedly noted mild depression, chronic irritable bowel syndrome, and that both lupus and fibromyalgia "seemed stable" (Tr. 206-07, 331). During her care through Cigna, Kant was prescribed Vioxx, Vicodin, Plaquenil, Betamethasone ointment, Belladonna, ranitidine, Trazedone, and Naprosyn (Tr. 206, 222).

Dr. Nada Krnjaich assumed Kant's care in October 2003, and referred her to rheumatologist Dr. Shakir (Tr. 328, 356). When she first saw Dr. Shakir in October 2003, she

was taking Vioxx, Plaquenil, Roxicet, Trazedone, and Hydrocodone; all except the Hydrocodone he continued to prescribe, along with a daily exercise regimen (Tr. 357-58). During Kant's last visit to Dr. Shakir in November 2003, he again diagnosed fibromyalgia and recommended that she "see a pain specialist for her chronic persistent pain" (Tr. 355).

Through Dr. Krnjaich's referral, rheumatologist Dr. Nolan assumed treatment in January 2004 (Tr. 391). Dr. Nolan noted her constant pain, constipation, persistent cough, "brain fog," and inability to concentrate were all complaints due to her fibromyalgia (Tr. 289-90). In May 2004, Dr. Nolan completed pain and fatigue assessments at the request of Kant's counsel; he concluded that her pain and fatigue were at the "moderately severe" level, which "constantly" interfered with Kant's ability to concentrate and perform tasks in a timely manner (Tr. 392-95). Additionally, he ascertained that she would not be able to maintain a regular work schedule (Tr. 393).

**Psychological Evaluation**

In addition to the above treating physicians, Kant was also referred for a psychological evaluation in conjunction with her pending claim with the Arizona Department of Economic Security (Tr. 239). Psychologist Dr. Huddleston conducted a full psychological evaluation in April 2003, concluding that Kant "does not suffer from any severe or debilitating psychological disorder" but also that "her physical problems appear real and they are somewhat exacerbated or magnified by her somewhat intense psychological style" (Tr. 243). Regarding Kant's abilities to function in a work environment, Dr. Huddleston concluded that she is cognitively capable of performing work tasks, but may experience difficulty in sustaining focus (Tr. 243). Further, regarding normal work pressures and typical daily demands, he concluded that "Ms. Kant would likely suffer a significant limitation." *Id*.

**Nonexamining State Agency Physicians**

During the initial and reconsideration determinations, Dr. Haley in April 2003 and Dr. Campbell in July 2003 completed assessment forms on behalf of the state agency (Tr. 231-38, 246-59, 260-85). Dr. Haley concluded that Kant had no manipulative, visual, or communicative

1  limitations, and that the only limitation she may suffer is exposure to cold temperatures due to
2  the presence of Raynaud's Syndrome (Tr. 231-35).  Although she assessed mood disturbance,
3  she found Kant's impairments to be not severe, and that daily living activities and concentration
4  were only mildly limited (Tr. 246, 256).  Dr. Campbell reviewed Kant's medical file during the
5  reconsideration period.  He diagnosed depressed mood and pain disorder, noting that Kant
6  suffered to a moderate degree in social functioning and maintaining concentration, but that her
7  symptoms did not prevent her from performing light work (Tr. 260-85).

8  However, instead of discussing these physicians' assessments, during the hearing the
9  ALJ relied upon the testimony of neurologist Dr. Goren.  Prior to the hearing, Dr. Goren
10 reviewed Kant's entire medical file and submitted a questionnaire for the ALJ (Tr. 287).  Dr.
11 Goren has never met the claimant and testified from Cleveland. Ohio.

**Administrative Hearing**

At the May 27, 2004 hearing, testimony was given by Kant, Dr. Goren, and vocational expert Linda Heiland.  Claimant's counsel established that as of that date, Kant was taking Vioxx, morphine sulfate, Soma, Tonazapam, Zelnorn, and Plaquina, noting that the numerous medications "in and of themselves in terms of side effects [sic]…would impact the ability to sustain work activities" (Tr. 37-39).

Kant testified that she stopped working in August 2001, when she was let go due to excessive absences because of her illness (Tr. 39).  Her afflictions include lack of sleep for several days at a time, pain in her right shoulder so severe that she is often unable to lift or sit, pain throughout her body "like deep in the core bone pain and then it's surrounded by the muscle," fibromyalgia "flares" which occur whenever Kant does exert, stress, and depression (Tr. 39-43).  She also has very painful irritable bowel syndrome, which keeps her awake at night (Tr. 47).  Additionally, the medications she is prescribed result in side affects including drowsiness that restricts her to lying down for six hours in an eight-hour period.

Kant reports that she suffers depression from being isolated and unable to assist her family in the household chores and shopping (Tr. 43-45).  Her ability to drive fluctuates because

- 4 -

1   she says she is often in a "fibro fog," and she is unable to do laundry, vacuum, wash dishes, or
2   cook (Tr. 45).  Since moving to Arizona in 2002, she has taken one trip to visit family in
3   Wisconsin, during which time the doctor increased her pain medication so that she was able to
4   travel (Tr. 47).  She testified to the ALJ that her work history includes primarily positions as an
5   office manager, and she completed two years of college (Tr. 47-48).

6         The ALJ also questioned her about her exercise regimen, as prescribed by Dr. Nolan.
7   She testified that she continues physical therapy exercises from her home, as well as water
8   aquatics (Tr. 48-49).  Her daily activities include waking up with her children, taking a hot bath
9   and returning to bed (Tr. 49-50).  She tries to do exercise, takes hot baths four times per day,
10  occasionally sends e-mail, and spends most of her time lying down; "it's the only time that I'm
11  comfortable" (Tr. 50).

12        Next, Dr. Goren testified that although all rheumatologists who examined Kant
13  diagnosed fibromyalgia, her orders to lay down during the day are contrary to his suggested
14  treatment of getting a lot of exercise (Tr. 52).  Additionally, Dr. Goren disagreed with the
15  prescription of narcotics for fibromyalgia, and suggested that these prescriptions were
16  contributing to her pain and inability to concentrate (Tr. 53).  Unlike all previous treating
17  physicians, Dr. Goren diagnosed Kant with lupus, and restricted her to light work with no high
18  production quotas (Tr. 54).  He also admitted that although he has treated fibromyalgia patients
19  in the past, he was in fact a neurologist who had never met the claimant and has not treated a
20  patient since 1996 or 1998 (Tr. 54-55).

21        Finally, Ms. Heiland testified as a vocational expert, describing Kant's work history as
22  primarily in office management or retail managing positions (Tr. 56).  These positions range in
23  skill level from sedentary skilled to medium skilled.  At this point, the ALJ posed various
24  hypotheticals, and Heiland responded as follows:  (1) assuming an individual with the
25  limitations posited by Dr. Goren, she would not be able to perform her past work, but there
26  would be light, unskilled jobs available, such as information clerk or parking lot attendant; (2)
27  assuming an individual with the restrictions assessed by the DDS forms, she would be able to
28

- 5 -

perform her past sedentary work as an office manager, or as an information clerk; (3) assuming an individual missing four or more days of work per month and who could not complete assigned tasks in an eight-hour day, as found by Dr. Nolan, such an individual would not be able to perform Kant's past relevant work nor any other work without special accommodations (Tr. 57-60). In response to counsel's additional hypotheticals, Heiland responded as follows: (1) assuming the limitations established by claimant's testimony, particularly the pain level and the need to lie down during the day, there would be no work that the individual could do; (2) assuming an individual with the level of pain and fatigue established by claimant that seriously affects the individual's ability to function, concentrate, or complete tasks in a timely manner, there would be no work that the individual could do; (3) assuming an individual established by claimant's testimony, who was seriously limited in dealing with co-workers, maintaining attention and concentration, and had poor to no ability to deal with the public and work stresses and reliability, there would be no work that the individual could do (Tr. 60-62).

Finally, the ALJ asked the vocational expert about transferable skills of the hypotheticals he originally posed to her; she responded as follows: (1) there are no skills that would transfer to the hypothetical jobs posed by the vocational expert in regards to Dr. Goren's assessed limitations; (2) regarding the second hypothetical with the limitations posited by the DDS forms, there would be transferable skills, to a job such as clerical supervisor (Tr. 62-63).

**ALJ Decision**

The ALJ found that Kant suffered from severe impairments: fibromyalgia, chronic fatigue syndrome, history of irritable bowel syndrome, affective disorder, and a history of lupus (Tr. 22). However, he concluded that these impairments "do not meet or medically equal one of the listed impairments" as required in the Regulations (Tr. 22).

The ALJ also noted that he found Kant's allegations regarding her limitations "not totally credible" (*Id.*). In doing so, the ALJ cited fragments of her testimony and written questionnaires, rather than her testimony as a whole (Tr. 19). The ALJ found that while her residual functional capacity rendered her unable to perform her past relevant work, she

- 6 -

1 maintains the capacity to perform a significant range of light work and that there are a
2 significant number of jobs in the national economy that she could perform (*Id.*).

3 The ALJ relied exclusively on nonexamining physician Dr. Goren, in concluding that her
4 residual functional capacity included a range of light work (Tr. 20).  Because Dr. Nolan had
5 treated Kant for only seven months, did not indicate that her symptoms would likely last for
6 twelve continuous months or longer, and because his conclusions were "neither supported by
7 the overall medical record nor the doctor's own progress notes," the ALJ gave his opinions
8 "little weight" (Tr. 19).  In doing so, the ALJ failed to cite any such examples in the record.

## STANDARD OF REVIEW

10 This court must affirm the ALJ's findings if they are supported by substantial evidence
11 and are free from reversible error.  *Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990).
12 Substantial evidence is more than a mere scintilla, but less that a preponderance; it is "such
13 relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
14 *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In determining whether substantial evidence
15 supports the ALJ's decision, the court considers the record as a whole, weighing both the
16 evidence that supports and that which detracts from the ALJ's conclusions.  *Reddick v. Chater,*
17 157 F.3d 715, 720 (9th Cir. 1998).  The ALJ is responsible for resolving conflicts, ambiguity,
18 and determining credibility.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995);
19 *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  If there is sufficient evidence to
20 support the ALJ's determination, the Court cannot substitute its own determination.  *See Young*
21 *v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990).

22 Thus, the Court must affirm the ALJ's decision where the evidence considered in its
23 entirety substantially supports it and the decision is free from reversible error.  42 U.S.C. §
24 405(g); *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).  The Court must do more than
25 merely rubber stamp the ALJ's decision.  *Winans v. Bowen*, 853 F.2d 643, 645 (9th Cir. 1987).
26 However, where the evidence is susceptible to more than one rational interpretation, the ALJ's
27 decision must be upheld.  *Magallanes*, 881 F.2d at 750.

**DISCUSSION**

**I.     ALJ's Rejection of Treating Physician.**

Kant first contends that the ALJ erred by rejecting the opinion of the examining physician, Dr. Nolan. The ALJ set forth three reasons for discrediting his testimony. First, the ALJ reasoned that Dr. Nolan had only treated Ms. Kant since January 2004, less than six months from the hearing before the ALJ. Second, the ALJ noted that Dr. Nolan "did not indicate that the claimant's symptoms would likely last for twelve continuous months or longer" (Tr. 19). Finally, the ALJ determined that Dr. Nolan's "medical conclusions are neither supported by the overall medical record nor the doctor's own progress notes" (*Id.*).

Because treating physicians are "employed to cure" and thus have a better chance to observe the patient, their opinions generally carry more weight than those of non-examining physicians. *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 (9th Cir. 1989); *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. § 404.1527(d)(1). An examining physician's opinion, even if contradicted, may only be rejected for specific and legitimate reasons that are supported by the record. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The ALJ provides "specific and legitimate reasons" by setting forth a detailed summary of the facts and conflicting evidence, and offering "his own interpretations and explain why they, rather than the doctors', are correct." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).

The ALJ's discount of Dr. Nolan's opinion was in error. Although Dr. Nolan treated Kant for a short time, so long as the treating physician has seen the patient long enough to obtain a "longitudinal picture of the patient's impairments," the source's opinion will be given more weight than a nontreating source. *See generally* 20 C.F.R. § 404.1527(d)(2)(i); *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). A treating physician has a continuing relationship with his patients, which makes him especially qualified to evaluate reports from previous doctors and form an overall conclusion as to a claimant's functional capacities and limitations. *Lester v. Chater*, 81 F.3d at 833. The ALJ rejected Dr. Nolan's opinion even though he was her current treating physician, as referred by her previous physician, Dr. Krnjaich

(Tr. 391). Because Dr. Nolan was in fact able to assess Kant's overall condition and impairments, this relatively short length of treatment should not discount his findings. *See generally* 20 C.F.R. § 404.1527; *Lester*, 81 F.3d at 833.

Next, the ALJ argues that Dr. Nolan did not indicate Kant's symptoms "would likely last for twelve continuous months or longer" (Tr. 19). The standard definition of disability used in the five-step sequential process by the Social Security Administration requires "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment…which has lasted OR can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505 (emphasis added); 42 U.S.C. § 423 (d)(1)(A). Here, the ALJ's decision states that Kant, "since at least 2002 . . . has had fibromyalgia" (Tr. 17). Because all parties agree that Kant has suffered from these impairments since at least 2002, this twelve-month threshold is ostensibly met. Further, because there is no known cure to Kant's impairments, while her symptoms may wax and wane, occasional symptom-free periods are not inconsistent with finding that claimant suffers disability. *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) (although claimant experienced some relief from his back pain, "in evaluating whether the claimant satisfies the disability criteria, the Commissioner must evaluate the claimant's ability to work on a sustained basis"); *see Leidler v. Sullivan*, 885 F.2d 291, 293 n. 3 (5th Cir. 1989).

Finally, the ALJ asserts that Dr. Nolan's medical conclusions are "neither supported by the overall record nor the doctor's own progress notes" (Tr. 19). In reviewing the medical record, fibromyalgia was diagnosed by all four physicians who treated Kant prior to Dr. Nolan (Dr. Venkat, first suspicious as of 4/29/02; Dr. Liao, 11/02; Dr. Mallace, first suspicious on 3/14/03; Dr. Shakir, confirmed diagnosis on 10/16/03; Dr. Nolan, "patient clearly has fibromyalgia" on 1/20/04) (Tr. 187, 227, 206-07, 354, 357, 389). All five treating physicians diagnosed Kant with lupus, irritable bowel syndrome, and mild depression, among other aches, arthralgias, and fatigue, during their treatment period. Further, Dr. Nolan's progress notes and clinical findings are consistent with his overall assessment and Kant's previous treating

1 physicians (Tr. 387-89).  Upon assessment, Dr. Nolan concluded that because of her
2 fibromyalgia and other complaints attributable to it, she would not be able to sustain work on
3 a regular and continuing basis (Tr. 393). Because the ALJ did not give specific examples of
4 inconsistencies in Dr. Nolan's conclusions or opinions, nor did the ALJ provide legitimate
5 reasons supported by substantial evidence in the record, his rejection of Dr. Nolan's opinion was
6 in error, and Dr. Nolan's assessment should be given controlling weight and accepted as a matter
7 of law. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998), *Lester v. Chater*, 81 F.3d 821,
8 834 (9th Cir. 1995).

9 **II.     ALJ Based Residual Functional Capacity on Opinion of Non-treating Physician.**

10 Kant next contends that the ALJ erred in granting substantial weight to the opinions of
11 non-examining medical expert, Dr. Herschel Goren. In general, opinions of physicians who do
12 not have a treatment relationship with a claimant are weighed by stricter standards, based "to
13 a greater degree on medical evidence, qualifications, and explanations for the opinions," than
14 are required of treating physicians. *SSR 96-6p* (1996); *see generally* 20 C.F.R. § 404.1527, §
15 416.927 (2005). Further, more weight is given to the opinions of a specialist regarding medical
16 issues related to their specialty than to the opinions of a source who is not a specialist. 20
17 C.F.R. § 404.1527 (2005).  The opinion of a non-examining physician is not a specific and
18 legitimate reason for rejecting a treating physician's opinion, and "without a personal medical
19 evaluation, it is almost impossible to assess the residual functional capacity of any individual."
20 *Penny v. Sullivan*, 2 F.3d 953, 957 (9th Cir. 1993).

21 In this case, although Dr. Goren had never met or examined the claimant, and despite his
22 specialty in neurology rather than rheumatology, the ALJ gave substantial weight to his medical
23 opinions (Tr. 20). Dr. Goren testified at the hearing, finding that because of Kant's restrictions
24 due to lupus, she would be able to perform the exertional demands of light work, limited to low
25 stress and minimal interaction with the public and co-workers (Tr. 54). However, during his
26 testimony, Dr. Goren provided very limited medical explanations for concluding that despite
27 his admission that "she's been examined by numerous rheumatologists. All of them think that

- 10 -

she has fibromyalgia," he instead concludes that she has lupus (Tr. 52, 54). Further, the medical questionnaire he submitted prior to the hearing is completely devoid of any analysis, explanation, or conclusions about her impairments (Tr. 287). Because the ALJ accepted this analysis and opinions during oral testimony, despite his specialty in a field other than rheumatology, and with a lack of medical explanations or detail, the ALJ erred in giving substantial weight to these opinions.

**III.    Evaluation of Kant's Residual Functional Capacity.**

Next, claimant contends that the ALJ erred in determining her residual functional capacity on a hypothetical question to the vocational expert and not a function-by-function assessment as required by the SSA. The process for assessing a claimant's RFC includes first identifying the claimant's limitations and restrictions to "assess his or her work-related abilities on a function-by-function basis," particularly their physical, mental, and other abilities affected by impairments. *SSR 96-8p* (1996); 20 C.F.R. § 404.1545. Only after this function-by-function analysis may the RFC be expressed in terms of exertion. *Id.* Further, if a hypothetical posed to the vocational expert is inaccurate, their testimony cannot be used by the Commissioner. *Andrews v. Shalala*, 53 F.3d 1035, 1044 (9th Cir. 1995).

Upon granting substantial weight to Dr. Goren's opinions, the ALJ proceeds by assessing Kant with the RFC of light work with low stress. This finding is a precise recitation of the non-examining physician, and does not take into account her physical, mental, and other abilities affected by her limitations, as required. 20 C.F.R. § 404.1545. These regulations outline the assessments an ALJ must make regarding a claimant's residual mental abilities, noting, "a limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work." To this effect, the ALJ again restates Dr. Goren's conclusions without explanation or elaboration. Further, RFC is the ability to do sustained work on a regular and continuing basis, which Dr. Nolan concluded she would not be able to do. *See SSR 96-8p* (1996) (emphasis

- 11 -

in original). Due to the incorrect application of claimant's RFC, the hypothetical posed to the vocational expert was inaccurate and not supported by substantial evidence in the record. Thus the ALJ erred in ignoring the limitations observed by the examining physician and instead bases its opinion exclusively on a non-examining physician's assessment of claimant's RFC, and posing an inaccurate hypothetical to the vocational expert.

**IV.   ALJ's Rejection of Kant's Testimony.**

Finally, claimant attests that the ALJ erred by discounting her testimony without providing clear and convincing reasons for doing so. The ALJ determined that "although the record supports the existence of the claimant's joint pain," objective medical evidence does not support the severity of claimant's joint pain and mental health problems, and that her "daily living activities simply are not consistent with her allegation of disability" (Tr. 19). Kant argues that unless there is affirmative evidence of malingering, the ALJ must identify what testimony lacks credibility and provide clear and convincing reasons for rejecting it. General findings that the claimant lacks credibility are insufficient; "rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

The initial burden is on the claimant to produce medical evidence of an underlying impairment, and once established, the Commissioner may not discredit the claimant's testimony as to severity merely because they are uncorroborated by objective medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991) (en banc). Here, the daily activities that the ALJ maintains are "inconsistent with her allegation of disability" include her ability to drive, run errands, use the computer, shop, do home exercising, physically move from California to Arizona in July 2002, and travel once to Wisconsin in 2003 (Tr. 19). Because the claimant produced evidence of an underlying impairment, the ALJ erred by discounting the severity of her limitations without specific, cogent reasons.

Kant's testimony indicates lack of sleep, extreme pain in her shoulder ("it's always there"), hands, knees, lower back, elbows, wrists, all of which "spikes when you do things," drowsiness, depression, and "it's been four years now and there's been no remission" (Tr. 40-44). According to her Activities of Daily Living Questionnaire, which the ALJ uses to discredit her testimony, it is clear the administrator used only selected portions of Kant's responses. For example, in response to claimant's ability to go shopping, she responded: "Rarely—as my youngest daughter's birthday is almost here, I have 1 present but—my other children will be doing the shopping because I can't" (Tr. 136); "I can only shop for a few things . . . I can really only do short runs" (Tr. 140). As to her hobbies, Kant responded: "Most of my pastimes I have given up for now—reading, hiking, computer, letter writing . . . My physical exercise now consists of doing stretching exercises, simple neck rolls, arm stretches, and for my back . . . I try to do aquatic exercises—a few times a week." In context with her overall testimony, such responses do not indicate an inconsistency with her allegation of disability.

Additionally, the fact that claimant made one move from California in July of 2002, and traveled one time to Wisconsin in 2003, hardly qualifies as "daily activities" inconsistent with her claim of disability. Disability claimants "should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). It is well established that a claimant who does engage in numerous daily activities involving skills transferable to a work environment could reasonably be discredited by an adjudicator. *Bunnell v. Sullivan,* 947 F.2d 341, 346 (9th Cir. 1991) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). However, the SSA "does not require that claimants be utterly incapacitated to be eligible for benefits." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Kant's intermittent ability to perform occasional tasks that could be transmitted to the workplace[1] is not the same as being able to engage in 'substantial gainful activity'. *Kornock*

---

[1] On page 143 of the transcript, claimant notes that she attempts to straighten the bed in the mornings, but even at this, she "can't make the bed every day, it's just too much."

*v. Harris*, 648 F.2d 525, 527 (9th Cir. 1980). Based on the overall record, the ALJ erroneously discounted Kant's testimony, and in failing to articulate specific reasons for finding claimant to be lacking in credibility, this testimony is to be accepted as true. *Hammock v. Bowen*, 879 F.2d 498, 503 (9th Cir. 1989) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987)).

## CONCLUSION

The ALJ's decision that Kant's residual functional capacity leaves her capable of performing many jobs readily available in the national economy is not supported by the substantial evidence in the record. Examining physician Dr. Nolan found that Kant suffered from significant exertional limitations and constant interference on concentration, memory, and attentiveness due to fatigue. The ALJ's finding of non-disabled was premised on a non-examining physician's belief that Kant's various medical prescriptions were contributing to her limitations, and that she was not getting enough exercise as part of her treatment. Non-examining physician Dr. Goren did not elaborate, either on his medical questionnaire or while giving testimony at the hearing, by explaining these conclusions, nor did the ALJ provide clear and convincing reasons for dismissing Dr. Nolan's conclusion and instead granting substantial weight to Dr. Goren's testimony, and thus, was in error. Accordingly, the ALJ also erred in basing its decision of residual functional capacity on a hypothetical question to the vocational expert based on Dr. Goren's conclusion that Kant would be restricted to light work with low stress. Because the vocational expert's opinion was based on assumptions not supported by substantial evidence in the record, it has no valuable significance. Finally, the ALJ erred in extracting limited excerpts from Kant's Activities of Daily Living Questionnaire rather than considering all of her written answers and oral testimony in full context. The examining physician's findings provided objective medical evidence of the physical and mental impairments that Kant testified to suffering, which fulfills her initial burden of demonstrating an underlying impairment. Thus the ALJ erroneously discounted the testimony of Kant.

**REMAND**

The decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of this Court. *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989). A remand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits. *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001). This rule recognizes the importance of expediting disability claims. *Ghokassian v. Shalala*, 41 F.3d 1300, 1303 (9th Cir. 1994).

When the ALJ does not provide adequate reasons for rejecting an examining physician's opinion, that opinion is credited "as a matter of law." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) (quoting *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir. 1989). Here, the ALJ did not provide any reasons for rejecting the opinions of the examining physician, Dr. Nolan. Thus his opinion that Kant's impairments would decrease her ability to deal with work stresses, maintain concentration and attention, and demonstrate reliability, and would require her to lie down during the day and take frequent naps, is accepted as a matter of law.

Similarly, where the ALJ fails to properly refute a claimant's testimony regarding her symptoms, that testimony is accepted as true as a matter of law. *Rodriguez v. Bowen*, 876 F.2d 759, 761 n.6 (9th Cir. 1989). Here, the ALJ did not provide clear and convincing reasons for discrediting her testimony because of the faulty rejection of the examining physician's opinion and inadequate analysis of her testimony and written descriptions of her limitations. Thus this Court accepts Kant's testimony as true as a matter of law.

Because Kant established her disability and proved that she could not return to past gainful activity in step four of the sequential evaluation process, the burden shifted to the ALJ to show that Kant is able to perform other work available in the national economy. The ALJ did not meet this burden because he erroneously used the non-examining physician's residual functional capacity assessment in obtaining the opinion of the vocational expert. In using the conclusions set forth by the examining physician and the claimant's testimony, the vocational expert agreed "there would be no work that she could do" (Tr 60). Thus, at step five of the

evaluation, Kant would have been found disabled. When properly considered, the evidence indicates that a determination of not disabled would not be supported by substantial evidence.

**IT IS THEREFORE ORDERED** that Plaintiff Lori E. Kant's Motion for Summary Judgment (Doc #7) is granted.

**IT IS FURTHER ORDERED** that Defendant's Cross Motion for Summary Judgment (Doc. # 13) is denied.

**IT IS FURTHER ORDERED** that this case be **REMANDED** for an **AWARD OF BENEFITS**.

DATED this 22nd day of September, 2006.

_____
David K. Duncan
United States Magistrate Judge